# EX. 2

EXHIBIT 2

James Kelley / Kelley Engineering
POB 624, Swansboro, NC 28584
V & F - 910.554.3083
PLAINTIFF

STATE OF NORTH CAROLINA

COUNTY OF ONSLOW

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO. _____

James Kelley / Kelley Engineering )
                                     )
          Plaintiff,         )
                                     )
          vs.               )       COMPLAINT
                                     )

Enviva LP, John Keppler, Norb Hintz, )
Enviva Pellets Ahoskie LLC,         )
Enviva Pellets Northampton LLC,   )
Enviva Pellets Southampton LLC,   )
Enviva Holdings LP,             )
"John Doe" Corporation(s) and/or Partnership(s) )
                                     )
          Defendants.    )

Plaintiff, James Kelley / Kelley Engineering, complaining of Defendants Enviva LP, John Keppler, Norb Hintz, Enviva Pellets Ahoskie LLC, Enviva Pellets Northampton LLC, Enviva Pellets Southampton, LLC, Enviva Holdings, LP and "John Doe" Corporation(s) and/or Partnership(s), alleges and says as follows:

### *PARTIES, JURISDICTION AND VENUE*

1. James Kelley / Kelley Engineering (hereinafter "Plaintiff") is a sole proprietor with principal place of business in Swansboro, Onslow County, North Carolina. Plaintiff's primary business is Commercial and Industrial Project Development.

2. Defendants Enviva LP, Enviva Pellet Northampton LLC, Enviva Pellets Ahoskie LLC and Enviva Holdings LP are Delaware entities that transact business and own physical assets and property in North Carolina.

3. Defendant Enviva Pellets Southampton, LLC and "John Doe" Corporation(s) and/or Partnership(s) are Delaware entities that transact business in North Carolina and Virginia and own physical assets and property in North Carolina and/or Virginia.

4. Defendants Mr. Norb Hintz and Mr. John Keppler are individuals that transact business in North Carolina and Virginia and appear to reside in Maryland.

5. This action is to recover damages for Breach of Contract, Account Stated with Money Owed, Breech of Implied Covenant of Good Faith and Fair Dealing, Fraud and Unfair and Deceptive Trade Practice.

6. This Court has jurisdiction over the parties and the subject matter of this dispute.

7. Venue is proper in Onslow County under North Carolina laws.

8. The amount in controversy is in excess of $10.000.

## FACTUAL ALLEGATIONS

9. In early April 2012, Plaintiff was contacted by representatives and employees for the Defendants soliciting Project Management and Professional Services from Plaintiff.

10. In early May 2012, the parties executed an Engagement Letter and temporary contract for professional services in North Carolina (the "Temporary Contract'), valid 7may12 through 30jun12, requiring Plaintiffs services exclusively to the Defendants via Enviva LP. The Temporary Contract is attached as *Exhibit One*.

11. The professional services were to be performed from Plaintiff's Swansboro, North Carolina office with travel to Defendants' Cary, North Carolina office, Bethesda, Maryland office and various plants and projects in North Carolina and Virginia as warranted.

12. It was initially anticipated that the Plaintiff would become chiefly responsible as "Senior Project Manager" for the Enviva Pellets Southampton LLC project ("Southampton") at Franklin, Virginia, but also providing services for the Enviva Pellets Northampton LLC Project ("Northampton") at Gaston, North Carolina according to the Defendants' strategy of "sister plants". Defendants represented to Plaintiff that the Southampton property has secured, design was well advanced and that construction would begin in mid-June 2012. Plaintiff inquired whether the projects were fully funded. Officers of the Defendant responded that the projects and companies were fully funded with equity and no debt and that there would be "no project delays due to money". Plaintiff relied upon the representations and promises of the Defendants in entering into the contracts.

13. Defendants were responsible for providing Plaintiff with staff, equipment and facilities outside of Plaintiff's Swansboro, North Carolina location and as required for travel. Communications and record keeping would be by means of e-mail, electronic records / data and internet share-directories.

14. As required by the Defendants, for the period May 2012 through June 2102, Plaintiff performed the professional services at Defendants' office space subleased at the facilities of Midsouth Engineering in Cary, NC and at Plaintiff's office in Swansboro, NC.

15. Defendants required that Plaintiff provide services solely to them and that Plaintiff undertake no assignments or other work for any other clients during the term of their agreement. Defendants provided and required that Plaintiff use an assigned email account, hosted in their facilities in addition to Plaintiff normal procedures. Defendants required that all of Plaintiff's work for other Client's projects be completed by the end of mid-June 2012. In reaching agreement to work solely for Defendant's benefit, Plaintiff relied upon the representations, promises and guarantees of the Defendants for full work and compensation through at least December 2013 in exchange for foregoing other work.

16. Plaintiff wholly relied upon the business plans, execution strategies and financial representations of the Officers of the Defendants in agreeing to work solely for the Defendants through at least December 2013. As a result, by June 2012 Plaintiff had completed all other clients' work and notified existing and prospective clients that Plaintiff was not available for projects until at least January 2014. Plaintiff also turned down multi-year project contracts from other clients in May, June and July 2012 as a result of the representations, promises and guarantees of the Defendants for project work and compensation through at least December 2013.

17. Beginning in June 2012, Plaintiff notified and appraised the Defendants with regular reports and correspondence of irregularities, deficiencies, errors, omissions and defects with the design and

EXHIBIT 2

engineering work, products and deliverables provided by Defendants' separately contracted, capital projects engineer of record – Midsouth Engineering Company ("Midsouth") – as well as with the financial accounting and recordkeeping thereof. Plaintiff related to Officers of the Defendants concerns regarding mounting friction with Midsouth due to these changes. Officers of Defendants correspondence and responses recorded appreciation for Plaintiff's management of Midsouth and requested that Plaintiff both continue these same efforts of reform and improvement, as well as implement more rigorous monitoring, verification and accounting control that previously done by the Defendants. Plaintiffs related services in this area continued through January 2013, with the review, approval and consent of Officers of the Defendants.

18. Concurrently, beginning in June 2012, Plaintiff advised Defendants that the design and engineering production schedule and related procurement schedule (together known as the "CPM Schedule") were not accurate due to inadequate staffing and manpower- both for Midsouth Engineering and Defendants personnel – as well as- overly aggressive performance goals. Plaintiffs related services in this area continued through January 2013. Officers of the Defendants continually acknowledged receipt of Plaintiff's reports and recommendations and authorized Plaintiff to continue efforts for change, improvement and remediation – as well as- promising that the projects would be adequately staffed "in the near future".

19. On 11jun12, Officers of the Defendants notified Plaintiff that they were putting a "Hold" on the Enviva Pellets Southampton LLC project at Franklin, Virginia. The Defendants instructed Plaintiff to delay all engineering design, except "essential" site design and permitting, as well as major equipment procurement and field work contracting until project financing could be procured. Defendants did not provide the duration for this "Hold".

20. At the same time as the notification of the "Hold" for financing, Plaintiff was instructed by Defendants not to reveal this information to Midsouth or any outside party- since it would "contradict information in the market and press". Plaintiff was assured by Officers of the Defendants that Plaintiffs agreement was not in jeopardy and that Plaintiff's work and compensation were assured through at least December 2013, albeit on a revised execution schedule, but without reduction. Plaintiff relied upon the representations, promises and guarantees of the Defendants in continuing under contract with Defendants.

21. On 19jun13, after review, consultation and coordination with Officers of the Defendants, Plaintiff meeting with Midsouth Engineering to review manpower, design, engineering and schedule deficiencies with Midsouth's performance for the Southampton project. Midsouth management said that it would take "two to three weeks" to sort out their remedies for the deficiencies. Plaintiff reported the results of this meeting to Officers of the Defendants. Plaintiff sought and received approval from Officers of the Defendants for this course of action with Midsouth.

22. On 29jun12, Plaintiff was requested by Officers of the Defendants to develop a "Ramp-up" Budget Estimate and Schedule for Southampton due to the "Hold". Plaintiff was required to keep the details of the "Ramp-up" and "Hold" as confidential information – not to be released to any outside party. Officers of the Defendants assured Plaintiff that the financial resources of their companies were adequate for the Projects and that this was a "temporary bump in the road". Plaintiff relied upon the representations, promises and guarantees of the Defendants in agreeing to work solely for Defendants benefit.

23. Plaintiff's temporary contract with Enviva LP terminated on 30jun12. Discussions between the Plaintiff and Officers of the Defendants were conducted exploring options whereby the Plaintiff might become an employee of the Defendants. However, terms of agreement for an employment

contract could not be reached due to policy issues of the Defendants. By mutual agreement, Plaintiff continued to provide Defendants with professional services, materials and goods under oral contracts – supported by electronic agreements with authorized Officers of the Defendants- beginning on 30jun12 with end date not sooner than December 2013. In exchange, it was agreed that Plaintiff would work solely for the Defendants and that Plaintiff "would not leave the Southampton project until completion". It was agreed that Plaintiff's terms from the Temporary Contract would continue and Plaintiff would bill at a rate of $65 per each hour worked plus expenses and costs.

24. In July 2012, Plaintiff's services were expanded at the request of the Defendants for additional professional services including, but not limited to: Engineering and Design Division procedures and process reorganization; Capital Project Accounting redesign including estimating, cost tracking and software implementation; Personnel Recruiting and Staffing; Vendor and Supplier sourcing and quotation; Equipment and Material Procurement; Standard Contract and Exhibits development in association with Counsel; Permitting and Approval oversight. Defendants promised Plaintiff a project completion bonus of not less that 15% of compensation with a target range of 25% ("bonus promise"). In agreeing to expand professional services, time and effort- with no change in rates or fees, Plaintiff relied upon the representations, promises and guarantees of the Defendants particularly the promise of full work and compensation without break through December 2013 ("duration promise"). In exchange for Defendants bonus and duration promises, Plaintiff agreed with Officers of the Defendants that all time worked would be recorded, but only 55 hours per each week would be billed. The hours recorded but not billed would be credited upon fulfillment of the contracts duration term and payment of at least the minimum bonus. Typically, Plaintiff worked and travelled in excess of 70 hours each week – solely for Defendants' benefit.

25. On 11jul12, Plaintiff provided Defendants with a draft Southampton "Ramp-up" Budget Estimate and related work execution plan. Several revisions of the "Ramp-up" plan were jointly worked on between Plaintiff and Defendants until a suitable presentation version was available for Defendants' Investment Committee.

26. On 17jul12, at Bethesda, Maryland – Plaintiff with Officers of the Defendants presented the "Ramp-up" Budget Estimate and related work execution plan to John Keppler (Chairman and CEO for the Defendants) – in person. At this meeting, Plaintiff was instructed by Mr. Keppler to conserve funds as much as possible in anticipation of a late October 2012 release to proceed full speed ahead after project financing had been secured. Mr. Keppler again reminded Plaintiff to keep this information confidential since it was sensitive relative to Defendants statements to the public, investors and potential lenders.

27. On 30jul13 – via an email memo- Plaintiff first became aware that employees of Midsouth had conducted an unauthorized, public meeting with local officials in Franklin, VA which would have a material impact on the schedule and budget for the Southampton project. Plaintiff immediately notified Officers of the Defendants and -with concurrence and approval- sent a reprimand and notice to Midsouth management. The reprimand also reminded Midsouth that unauthorized public meetings were contrary to their contract with Defendants. Midsouth management acknowledged their error and agreed to remedial measures and controls to prevent future errors. A meeting was arranged to discuss how to address future permitting items and specifically to review the project fire protection requirements.

28. On 8aug12, after review, consultation and concurrence with Officers of the Defendants, Plaintiff met with Midsouth management to request justification and supporting information regarding the structural design and related criteria for the Southampton project since there were continuing

concerns that "over design" and "excessive conservancy" were negatively affecting project budget and schedule. The Plaintiff's request was not well received by Midsouth management in that the request was viewed as questioning their engineering competency and judgment. However, after further discussion, Midsouth management agreed to provide Plaintiff with the requested information in a "week or so".

29. Work at Southampton physically began on 20aug12 with work limited to site grading under the "Ramp-up" plan. Site supervision was conducted by a contractor hired in July 2012 by the Defendants and reporting to the Plaintiff. Officers of the Defendants- under instruction by Mr. Keppler - required a third bidding of the general contract by reintroducing a third contractor who had previously elected not to participate. Plaintiff and Midsouth both notified Defendants of his concerns about multiple re-bids for the same work and the perception of "bid-shopping" by Defendants. Defendants instructed Plaintiff to re-bid the general contract scope of work.

30. On 27aug12, Midsouth presented the Plaintiff with a first draft, e-copy of the design schedule promised at the 8aug12 meeting. Plaintiff forwarded the draft schedule to Officers of the Defendants for review.

31. On 15sep12, Plaintiff send Officers of the Defendants further notice of deficiencies with the schedule, accounting and related billings of Midsouth. Defendants instructed Plaintiff to continue pursuing the matter and to bring Midsouth into compliance with requirements as outlined by Plaintiff. Plaintiff related to Officers of the Defendants concerns regarding continuing friction with Midsouth management due to the rigorous changes being imposed for the Southampton project. Officers of Defendants –again- responded with appreciation for Plaintiff's management of Midsouth and requested that Plaintiff continue his efforts in this regard. In particular, Mr. Norb Hintz – an Officer of the Defendants – offered his "full support" and backing on these matters.

32. 23oct12, Officers of the Defendants first notified Plaintiff that Independent Engineers for Lenders would begin making project inspections. Plaintiff was asked by Officers of the Defendants to manager Independent Engineers visits to the Southampton project. This was the first time that Plaintiff was notified that lenders would be involved in and inspecting the projects. This information was very significant to the Plaintiff's execution strategy – since Lender requirements often have a chilling effect on innovation and expediting on construction projects.

33. 28oct12, Hurricane Sandy was in the vicinity of the Southampton project and flooded the site. Plaintiff directed pre-storm preparations – as well as post storm remedial measures. There was no significant damage to property.

34. 31oct12, the third competitive bidding for the general contract at Southampton project closed with Century Contractors the apparent successful proposal with financial, personnel and performance reservations expressed and detailed by both Plaintiff and Midsouth. Plaintiff advised Officers of the Defendants of the results and the reservations of the review team. The preferred contractor of the Defendants – Century Constructors- was never the less selected by Officers of the Defendants. Century was the selected contractor already working on the Northampton project. In particular, Mr. Norb Hintz had expressed a strong preference that Century "win Southampton" and also was very interested in proving his personal theory that having the same contractor as Northampton and Southampton would generate savings for the Defendants.

35. On 1nov12, Plaintiff sent additional notice of schedule and manpower/staffing deficiencies to Midsouth management at the request and approval of the Officers of the Defendants. At this point, it was physically evident that Midsouth's design delays on the Northampton project were impacting

both available personnel for the Southampton project – as well as necessary design production for Southampton. Midsouth management acknowledged that their resources were severely strained and began a search for additional personnel and subcontractors in order to meet the Defendants construction schedules for Northampton and Southampton. This resulted in considerable "friction" for both the Northampton and Southampton projects through no fault or action by the Plaintiff. It was recognized by the Defendants that the execution bottleneck had been caused by their inadequate staffing and manpower projections earlier in the year.

36. On 8nov12, Officers of the Defendants notified Plaintiff to expedite procurement and contracting for the Southampton Project. Plaintiff was directed by Officers of the Defendants to develop a revised Project Schedule and Cashflow for Southampton by early December 2012 and to "hire people – fast".

37. During mid-November 2012, in a series of meetings and teleconferences with Officers of the Defendants, Plaintiff recommended that Midsouth's responsibilities only be focused on those areas of their core historical engineering competencies – namely mechanical and electrical engineering of central wood processing equipment and related structures. Plaintiff recommended that local firms with greater strength in architecture and civil design and permitting replace Midsouth. Officers of the Defendants told the Plaintiff to develop alternative plans, but not to disclose these plans or strategies to Midsouth.

38. On 14nov12, Defendants obtained project financing of $120 million via a "Senior Secured Credit Facility" arranged by Barclays Bank PLC, Goldman Sachs Bank USA and Royal Bank of Canada.

39. On 26nov12, after review and consensus with Officers of the Defendants, Plaintiff made a fourth request to Midsouth management for supporting details and accounting, consistent with their agreement with Defendants, for invoices on the Southampton project. After some additional complaints and waffling, Midsouth agreed to provide the required information to Plaintiff within one week.

40. On 27nov12, Plaintiff was invited to the Annual Meeting of the Defendants to be held in Bethesda Maryland in 10-11dec12. Plaintiff was asked to prepare some presentation materials for portions of the meetings to be conducted in conjunction with the Annual Meeting.

41. On 4dec12, Plaintiff met with Midsouth management to review their remedial plans for manpower staffing and design execution in order to get on track for the Southampton project. Midsouth agreed to provide statused, weekly schedule updates to Plaintiff. Plaintiff notified Officers for the Defendants of Midsouth's revised commitments and voiced concerns for their ability to execute as promised. Officers of the Defendants told Plaintiff to "keep pushing on Midsouth".

42. 10-12dec12, Plaintiff attended Defendants' Annual Meeting for employees – as well as departmental and strategy planning meetings at Bethesda, Maryland. A central theme of the meetings was Defendants' and Riverstone's plans to make the companies ready for an initial public offering to the market and what would be required of the Northampton and Southampton teams in order to meet this goal. Officers of the Defendants represented that "all would participate in the good fortunes ahead" associated with the IPO and other business plans. Officers of the Defendants continually stressed at these meetings that it was essential at Northampton and Southampton that "we do what we said we'd do" and that "market perception was everything". Plaintiff relied upon the presentations, business plans, representations, promises and guarantees made by the Defendants at these meetings. Included in these promises to Plaintiff was that Plaintiff would participate in the long-term plans of the Defendants.

43. 17dec12, Officers of the Defendants requested that the Plaintiff attend and participate in schedule and logistics meetings for the Northampton Project which was behind schedule and not going smoothly. During these meetings, Plaintiff and Officers of the Defendants discovered that there was no schedule (by anyone) detailing or showing which work forces – were working – where or when by Century. Plaintiff was asked to assist with improving the CPM schedule format for Northampton so that Century's work products for Southampton would be more useful for tracking and forecasting, as well as for billing.

44. On 18dec12, upon conclusion of planning and site inspection meetings at Northampton, Norb Hintz (Senior Vice President for the Defendants) asked the Plaintiff outside the meeting room – where Plaintiff was informed that Kerry Yeager (Executive Director for the Defendants not present at these meetings) was being replaced. Mr. Yeager was the Officer Plaintiff reported to. Mr. Hintz said that Plaintiff was thereafter to report directly to Mr. Hintz and to not inform anyone about this information including the Independent Engineer (who Plaintiff would see the next day). Plaintiff asked Mr. Hintz if he "should be concerned about his job". Mr. Hintz responded that Plaintiff was performing "exceptionally" and had "absolutely" no reason to worry. Plaintiff relied upon the representations, promises and guarantees of Mr. Hintz in agreeing to continue working solely for Defendants benefit through December 2013 and in making no efforts to find additional project work prior to the end date of the contracts.

45. On 18dec12 (the same day), Plaintiff obtained the permission of Mr. Hintz to discuss the replacement of Mr. Yeager with Mr. Yeager. Plaintiff immediately contacted Mr. Yeager and was told by Mr. Yeager in a very short call that he had no knowledge of this action by Mr. Hintz or Mr. Keppler. The Plaintiff and Mr. Yeager agreed to talk on the weekend about the situation. Plaintiff asked Mr. Yeager whether Mr. Hintz and Mr. Keppler "were honorable men" ? Mr. Yeager responded that "we'll soon see".

46. On 19dec12, during an Independent Engineer inspection and review of the Southampton project, Plaintiff had occasion to drive to lunch alone with Mr. John Keppler at Mr. Keppler's request. During the drive, Mr. Keppler expressed his appreciation for all "the effort, hard work and changes" performed by the Plaintiff. Plaintiff asked Mr. Keppler if he should have any concern for his job duration in light of the sudden replacement of Mr. Yeager. Mr. Keppler again told the Plaintiff that he was "doing a great job" and that Defendants "needed more folks like him"; that Plaintiff and the company had a "bright future" and "not to worry". Mr. Keppler said that it was important to portray an "image of stability" to the Independent Engineer at their luncheon. Plaintiff relied upon the representations, promises and guarantees of Mr. Keppler in agreeing to continue to work solely for Defendants through December 2013 and in making no efforts to find additional project work prior to that date. The Independent Engineer was favorable impressed by Plaintiff's preparations at Southampton as evidenced in his favorable site reporting.

47. On 3jan13, at the Southampton project, Plaintiff meet with Mr. Hintz to discuss project logistics and details. The documented performance deficiencies and delays by Midsouth were discussed at great length. Mr. Hintz instructed Plaintiff to "keep pushing on them for change" and that he "would support" these efforts. Mr. Hintz told Plaintiff to count on having additional supervisors reporting to him beginning in February and continuing through March, April and May. Mr. Hintz said to plan "on a lot of hard work through October" and" to look forward to a vacation break around next Thanksgiving". Plaintiff relied upon the representations, promises and guarantees of Mr. Hintz in agreeing to continue working solely for Defendants benefit through December 2013 and in making no efforts to find additional project work prior to that date.

48. On 11jan13, at the Southampton project, several coordination and planning meetings were conducted with Mr. Hintz participating remotely via "Go To Meeting" and others physically present. Mr. Hintz expressed only positive comments with regards to Plaintiff's supervision of the Southampton project.

49. On 14jan13, by email, Plaintiff received notice that Mr. Yeager had been "terminated" by Defendants. Plaintiff received no further information from Defendants.

50. On 22jan13, in a morning meeting with Mr. Hintz and Glen Gray (Project Sponsor for the Defendants), Plaintiff was told that Midsouth management was "upset with the lack of communication" and "their position" on the Southampton project. Plaintiff advised Mr. Hintz that his recommendation continued to be to segregate and reduce Midsouth's responsibilities such that they only focus on their core historical competencies. Plaintiff recommended that local firms with greater strength in civil design and permitting replace Midsouth. Mr. Hintz said that a meeting with Midsouth was needed later that day to "clear the air". Mr. Hintz said that despite all Midsouth's deficiencies and problems, "we had to find a way to work with them". Mr. Hintz said that "we need them". Mr. Gray said that it was "too late to change horses" since the Independent Engineer and lenders had "already approved Midsouth" and "we can't change". Thereafter Mssrs. Hintz and Gray and Plaintiff joined contractors, Midsouth and other project members for a regular status and procurement meeting.

51. Plaintiff left the morning status meeting, for other subcontractors' coordination meetings for approximately two hours.

52. On 22jan13, an afternoon design status meeting with Mssrs. Hintz and Gray and representatives from Midsouth Engineering was held at Mr. Hintz's request. After the meeting had been underway for approximately 90 minutes, as the meeting was close to conclusion, a manager of Midsouth made allegations against Plaintiff – of a personal, non-professional, slanderous nature – with regard to a particularly contentious due diligence and design point having to do with Midsouth's site design for Southampton. Plaintiff verbally defended his reputation and challenged the accusations of the Midsouth manager and competency of their civil design team. At which point verbal tempers – of all in the room – generally flaired. As a result Plaintiff then suggested that the meeting be ended since it no longer seemed productive. Plaintiff left the room for his office immediately adjacent to the meeting room. The meeting ended approximately two minutes later. Plaintiff went on to other site and coordination meetings at the site for the next four hours until about 19:00.

53. On 23jan13, Mr. Hintz confirmed (via email) that a new Purchasing Manager for the Defendants would be directly reporting to Plaintiff and that Plaintiff was to coordinate and direct the Purchasing Manager's assignments, work, responsibilities and schedule.

54. On 24jan13, Mr. Hintz informed Plaintiff that Midsouth would not be attending that week's regularly scheduled Southampton project status meeting (to be held that day). Mr. Hintz said he'd call Plaintiff later that day to explain Midsouth's absence. Plaintiff received no subsequent call from Mr. Hintz on the matter. Mr. Hintz sent a subsequent message telling the Plaintiff to plan for and expect an additional Civil Superintendant under his supervision in February.

55. On Saturday, 26jan13, Mr. Hintz called Plaintiff and informed him that he was having a problem finding a solution to "deal with Midsouth" and that Mr. Hintz preferred to separate responsibility for Midsouth supervision from overall project supervision for Southampton from Plaintiff's contract. Plaintiff responded that – subject to the terms of a commercial settlement- this logistical strategy was acceptable since it would have the Defendants directly supervising a non-performing

and difficult design subcontractor who did not appear able to meet contractual requirements. Mr. Hintz told Plaintiff that he needed Mr. Keppler's approval for any settlement. Plaintiff told Mr. Hintz that "we should separate the commercial issues from technical requirements. Plaintiff told Mr. Hintz that continuing project management work and development of a transition strategy for design supervision would be performed from the Swansboro office while Plaintiff awaited Mr. Hintz's proposal for clarification of responsibilities and a commercial settlement after his discussion with Mr. Keppler. Mr. Hintz requested that Plaintiff make available to him a duplicate of Plaintiff's proprietary sharedrive of procedures, forms, contracts, accounting, estimating and project related materials. Plaintiff agreed to Mr. Hintz's request subject to the forthcoming responsibility and commercial settlement promised by Mr. Hintz.

56. Plaintiff's contracts with Defendants did not allow any provision for termination of the Design Management portion of Plaintiff's contracts by Defendants for convenience prior to the later of either the Southampton project substantial completion or through December 2013. Since the Defendants sought a partial termination of Plaintiff contracts for Defendants' convenience, a contract amendment and associated commercial settlement was required under the terms of the Plaintiff's contracts.

57. On Monday, 28jan13, Plaintiff sent a memorandum to Mr. Hintz outlining Plaintiff's plan of action for changes on the Southampton project while awaiting Mr. Hintz's instructions on the revised management strategy that he wished to pursue for Defendants, as well as for the terms for the contract amendment and commercial settlement promised by Mr. Hintz. Plaintiff's memorandum is attached as *Exhibit Two*.

58. 28jan13 through 6feb13, Plaintiff updated and delivered project status reports, subcontracting summaries, execution schedules, procurement plans and prepared a duplicate of the Plaintiff's proprietary sharedrive.

59. On 6feb13, Plaintiff received a letter postmarked 2feb13 from Mr. Stephen Reeves, CFO for the Defendants. Plaintiff had only spoken to Mr. Reeves at Defendant's Annual meeting and had not had any other interaction, correspondence or business with Mr. Reeves in the preceding eight months of work with Defendants. Mr. Reeves' letter stated that "your engagement with Enviva LP" was terminated. Never having dealt with Mr. Reeves, Plaintiff was confused about the meaning of the letter. Plaintiff had no reporting requirements to Mr. Reeves. Plaintiff immediately called Mr. Hintz's office and cell phone numbers to ask about the meaning for Mr. Reeves' letter. Mr. Hintz was not available and voicemails were left at each number. Plaintiff's messages sought clarifications from Mr. Hintz on the meaning and intent of Mr. Reeves' letter. Plaintiff did not contact Mr. Reeves since Plaintiff did not know Mr. Reeves (later - seeing that Mr. Reeves letter referenced an email copy, Plaintiff subsequently checked filter and "spam" directories and did find an e-mail from Mr. Reeves).. Mr. Reeves' letter is attached as *Exhibit Three*.

60. In Exhibit Three, Defendants- through the use of the word *"engagement"*- clearly recognize that they have binding contracts with the Plaintiff. The Plaintiff's contracts with the Defendants do not provide for termination for convenience as outline above. Mr. Reeves' letter does not make clear what type of termination Enviva LP sought and for what reasons.

61. Plaintiff did not receive any correspondence or notice from Defendants regarding termination of Plaintiff's contract with Defendants- Enviva Pellets Southampton LLC, Enviva Pellets Northampton LLC or Enviva Pellets Ahoskie LLC.

62. On 7feb13, Plaintiff received several phone messages from subcontractors seeking clarifications on the Defendant's intent to dishonor prior commitments for the Southampton project. Plaintiff called Mr. Hintz's office and cell phone numbers but Mr. Hintz was not available and voicemails were left at each number. Plaintiff continued to request clarifications from Mr. Hintz on the meaning and intent of Mr. Reeves' letter.

63. On Friday, 8feb13, Plaintiff received notice from contacts of Defendants, that Mr. Carl Butner – Civil Superintendant- had been terminated without notice from the Southampton project. Plaintiff received no notice of Mr. Butner's termination. Plaintiff had subcontracted Mr. Butner on Defendant's behalf since July 2012. Mr. Butner's premature termination – in advance of the completion of civil work – came as a surprise to Plaintiff. Plaintiff called Mr. Hintz's office and cell phone numbers but Mr. Hintz was not available and voicemails were left at each number. Plaintiff continued to request clarifications from Mr. Hintz on the meaning and intent of Mr. Reeves' letter and also the reason for Mr. Butner's termination without any apparent cause.

64. 11-14feb13, were previously scheduled personal travel out of state for Plaintiff. Plaintiff worked remotely via computer and telephone during this period.

65. On 15feb13, having not received any clarification, information or correspondence from Mr. Hintz or the Defendants clarifying Mr. Reeves' letter, Plaintiff sent notice (by USPS Priority and email) to Mr. Reeves with copy to Mr. Hintz seeking clarification of Defendant's apparent preference to seek termination for convenience of Plaintiff's contract with Enviva LP. Plaintiff also sought clarifications of Plaintiff's other contracts with Defendants. Plaintiff's 15feb13 notice is attached as *Exhibit Four*.

66. Defendants have not acknowledged and have refused Plaintiff's feb13 requests to schedule resolution of the disputes between the parties in a meeting with a neutral referee.

67. On 19feb13, notice was sent to Mr. Hintz that telecom, data and messaging services to Defendants at their Cary, NC and Southampton, VA facilities would be terminated as of 28feb13.

68. On 28feb13, Plaintiff terminated telecom, data and messaging services to Defendants at their Cary, NC and Southampton, VA facilities as a result of the contractual dispute, outstanding balances due and failure to make payment. Payment for these services remains due and unpaid by Defendants.

69. On 13mar13, having not received any further directions or information from Defendants with regard to their apparent termination for convenience of the Enviva LP contract with Plaintiff and having made diligent inquiries and efforts over the prior 45 days to ascertain the Defendants' intents with regard to Plaintiff's other contracts with Defendants, Plaintiff sent Defendants notice of default and breach of contract- together with a billing of related charges, fees and costs. Defendants have not made any effort to remedy their default and breech. Plaintiff's notice of default is attached as *Exhibit Five*.

70. On or about 28mar13, Plaintiff received a letter from Mr. Reeves acknowledging Plaintiff's notice of default of 13mar13. Mr. Reeves letter goes on to state that the Enviva LP contract was terminated "for cause". This is the first notification that the Plaintiff received that termination of the Enviva LP contract was "for cause". There is no further clarification or information defining what "for cause" means or which terms of the contract have been purported to have been defaulted upon by the Plaintiff. Plaintiff has no knowledge or information regarding any material breach of any material term of the contracts with Defendants. No mention is made in Mr. Reeves' letter regarding Plaintiff's other contracts with Defendants. Mr. Reeves' letter does not meet the

requirements for termination of the Enviva LP contract as outline below. Mr. Reeves' letter is attached as *Exhibit Six.*

71. Under the applicable terms of Plaintiff's contracts with Defendants (ignoring the bankruptcy and non-payment provisions), it is required that: *"Either party may terminate this Agreement if (a) the other party breaches any material term of this Agreement, and fails to remedy such breach within thirty (30) days of receiving notice to do so by the non-defaulting party".* As outlined above, Plaintiff's contracts with the Defendants does not allow for termination for convenience.

72. Defendants never provided Plaintiff with any notice of a default or breach of any material term(s) of their contracts with Defendants as required under the terms of Plaintiffs contracts with Defendants.

73. Defendants never requested any remedies or corrections by Plaintiff of any default or breach as required under the terms of the Plaintiffs contracts with Defendants.

74. Defendants never allowed Plaintiffs the required thirty (30) day remedy period for any noticed breach of material term(s) of the contracts with Defendants. Accordingly, Plaintiff has been denied substantial rights and remedies provided for in the contracts.

75. On 23april13, having waited thirty days for Defendant remedy of the noticed breach without any action by Defendants, Plaintiff filed liens against Defendants' projects at Ahoskie, NC; Northampton, NC and Southampton, VA where professional services have been performed. Notice and Copies of the Liens were sent to Defendants concurrently. Copy of the Notice to Defendants with copies of the recorded liens is attached as *Exhibit Seven.*

76. As of this date, Plaintiff has transmitted to the applicable Clerks for recording Notices of Lis Pendens against the known affected properties - attached as *Exhibits Eight, Nine and Ten.*


### *FIRST CLAIM FOR RELIEF*

#### *Breach of Contract*

77. Plaintiff restates and realleges the allegations contained in paragraphs 1 through 76 above.

78. The contracts between the parties were continually acknowledged by the Defendants as evidenced by their use of the term "engagement", as well as by the daily, continuous coordination, correspondence and reporting by Plaintiff with Officers of the Defendants; receipt and payment of Plaintiff's billings for all periods May 2012 through December 2012, as well as through continuous weekly reporting and supplementary correspondence with the Officers of the Defendants.

79. Plaintiff has fully performed and completed all requested professional services of it required under contracts with the Defendants.

80. Plaintiff has made repeated demands of the Defendants to honor their commitments, promises and guarantees – including making payment. Defendants have failed and refused to honor their obligations under the contracts. Furthermore, Defendants have deprived Plaintiff of rights under the terms of the contracts.

81. Defendants' failure to fully perform their duties under the contracts with Plaintiff constitutes a material breach of the terms of those contracts.

82. As a direct and proximate result of Defendants' breach of contract, Plaintiff has been damaged in excess of $10,000, plus attorney fees, late charges, interest and costs from 13mar13 until paid.

## SECOND CLAIM FOR RELIEF

### Breach of Implied Covenant of Good Faith and Fair Dealing

83. Plaintiff restates and realleges the allegations contained in paragraphs 1 through 82 above.

84. Officers of the Defendants – including Mr. Hintz and Mr. Keppler – promised the Plaintiff project work through at least December 2013 with the agreed minimum weekly payments made by Defendants not being less than $3,575.00 plus expenses and costs through December 2013 inclusive.

85. Officers of the Defendants – including Mr. Hintz– promised the Plaintiff project work through at least December 2013 with a project completion bonus of not less that 15% of compensation with a target range of 25%.

86. In exchange for the duration and bonus terms of the contracts outlined above, Plaintiff agreed to record but not currently bill Defendants in excess of the agreed rate cap. Upon satisfaction by the Defendants of the duration and bonus terms of the contracts, Plaintiff would issue a final credit for the fees not billed under the agreement. Defendants' lack of good faith and fair dealing has deprived Plaintiff full payments and compensation for the value of professional services and goods.

87. The failure by the Defendants to honor the commitments, promises and guarantees of the Officers of the Defendants – including Mr. Hintz and Mr. Keppler- constitutes conscious and deliberate acts to avoid and ignore the Defendants responsibilities and obligations of Implied Covenants of Good Faith and Fair Dealing with Plaintiff in order for Defendants to materially gain to the financial and professional detriment of the Plaintiff.

88. As a direct and proximate result of Defendants' conduct, Plaintiff has been damaged in excess of $10,000, plus attorney fees, late charges, interest and costs from 13mar13 until paid.

## THIRD (Alternative) CLAIM FOR RELIEF

### *Money Owed(Quantum Meruit)*

89. Plaintiff restates and realleges the allegations contained in paragraphs 1 through 88 above.

90. At Defendants' request and based on the commitments, promises and guarantees of the Defendants', Plaintiff agreed to work solely for and to the exclusive benefit of the Defendants furnishing professional services and advancing expenses which Defendants knowingly and voluntarily accepted for current and future benefit to the Defendants.

91. The services rendered and expenses advanced were of substantial worth.

92. Plaintiff provided professional services and advanced expenses on Defendants' behalf based upon its belief that agreements existed with the Defendants whereby Defendants would pay for the services and advanced expenses full value through and including the contracts' duration and bonus terms outlined above. Plaintiffs contracted terms with Defendants essentially provide that a portion of each billing would not be billed until the end of the Southampton project and then credited against the bonus.

93. These professional services and expenses were not furnished by Plaintiff to Defendants as a gift or gratuity. Defendants obtained the current and advanced benefits and use of these professional services and expenses and has failed and refused to pay fully for them as of this date.

94. By virtue of these facts, agreements existed between the parties whereby Defendants agreed to pay full value, through and including the contracts' duration and bonus terms outlined above, for the advanced services and expenses they accepted from the Plaintiff. To deny payment to Plaintiff would result in unjust enrichment to Defendants. Plaintiff asserts that the reasonable value for the advanced services and expenses is in excess of $10,000.

## FOURTH CLAIM FOR RELIEF

### *Fraud*

95. Plaintiff restates and realleges the allegations contained in paragraphs 1 through 94 above.

96. Officers of the Defendants – including Mr. Hintz and Mr. Keppler- knowingly provided the Plaintiff with false and incorrect project, financial and corporate information – designed to mislead the Plaintiff regarding the Defendants capital projects schedule and financing efforts – in order to induce the Plaintiff into long term contracts commitments exclusively to the Defendants for their benefit to the detriment of the Plaintiff.

97. Officers of the Defendants – including Mr. Hintz and Mr. Keppler- clearly knew in May 2012 that Defendants were pursuing debt financing for their Northampton and Southampton projects and that Defendants could not execute the projects without the project debt financing. Defendants intentionally did not give Plaintiff this critical information. Instead, Officers of the Defendants – including Mr. Hintz and Mr. Keppler – intentionally misled Plaintiff with regard to their projects financing and schedule – so as to induce Plaintiff into making long term plans and contracts for Defendants benefit and material gain.

98. Officers of the Defendants – including Mr. Hintz and Mr. Keppler- repeatedly and knowingly provided the Plaintiff with false and incorrect project, financial and corporate information – in June 2012 through November 2012 – to continue to mislead the Plaintiff regarding the Defendants capital projects schedule and financing efforts– in order keep the Plaintiff's long term contracts commitments exclusively to the Defendants for their benefit to the detriment of the Plaintiff.

99. As a result of the false and knowingly incorrect project, financial and corporation information provided by Officers of the Defendants – including Mr. Hintz and Mr. Keppler- Plaintiff wound down and "mothballed" his consulting engineering and professional services practice. Additionally, Plaintiff sought no other clients or project work during the period June 2012 through April 2013 as a direct result of the false information and promises of the Officers of the Defendants – including Mr. Hintz and Mr. Keppler. Only after receipt of Mr. Reeves' letter did Plaintiff understand that he had been duped.

100. As a direct and proximate result of Defendants' fraudulent representations and intentionally erroneous information designed to mislead, Plaintiff has been damaged in excess of $10,000, plus attorney fees, late charges, interest and costs from 13mar13 until paid.


## *FIFTH CLAIM FOR RELIEF*

### *Unfair and Deceptive Trade Practice*


101. Plaintiff restates and realleges the allegations contained in paragraphs 1 through 100 above.

102. Agents and Officers of the Defendants – including Mr. Hintz and Mr. Keppler- repeatedly and knowingly provided false and incorrect information to local and State agencies in order to advance the Defendants business objectives and projects- including property and entitlement concessions from public agencies.

103. Agents and Officers of the Defendants – including Mr. Hintz and Mr. Keppler- repeatedly and knowingly provided false and incorrect information in permit applications in order to advance the Defendants business objectives and project approvals.

104. Officers of the Defendants – including Mr. Hintz and Mr. Keppler- required that employees and contractors for the Defendants substantiate and support the false and incorrect information under threat of termination for violation of confidentiality clauses or insubordination.

105. Plaintiff relied upon the false and incorrect information provided by the Agents and Officers of the Defendants – including Mr. Hintz and Mr. Keppler- including false information knowingly placed in the public domain by the Defendants. Whenever Plaintiff discovered false, erroneous or incorrect information of a substantial nature, Plaintiff was required by Officers of the Defendants to either ignore it or Defendant would transfer responsibility for such information to others.

106. The false information, misrepresentations and statements of the Officers of the Defendants on behalf of the Defendants was an intentional effort by the Defendants to deceive public officials, public agencies and communities affected by the Defendants business and projects.

107. Plaintiff was materially and financially damaged by reliance on the false public information, misrepresentations and statements of the Officers of the Defendants on behalf of the Defendants.

108. Plaintiff's professional reputation and character has been damaged by these business dealings and association with the Defendants.

109. As a collateral and consequential result of Defendants' breach of contract, Plaintiff has been damaged in excess of $10,000, plus attorney fees, late charges, interest and costs from 13mar13 until paid.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests of the Court the following relief:

1. Entry of Judgment against Defendants in excess of $10,000, plus interest at the legal rate from 13mar13, until paid in full, for Defendants' breach of contract, and that Defendants be held jointly and severally liable;

2. In the alternative, Entry of Judgment against Defendants in excess of $10,000, plus damages, plus interest at the legal rate from 13mar13, until paid in full, for Defendants' breach of Implied Covenant of Good Faith and Fair Dealing, and that Defendants be held jointly and severally liable.

3. In the alternative, Entry of Judgment against Defendants in excess of $10,000, plus interest at the legal rate from 13mar13, until paid in full, for Money Owed (Quantum Meruit), and that Defendants be held jointly and severally liable.

4. In the alternative, Entry of Judgment against Defendants in excess of $10,000, plus interest at the legal rate from 13mar13, until paid in full, for Fraud, and that Defendants be held jointly and severally liable.

5. In the alternative, Entry of Judgment against Defendants in excess of $10,000, plus damages, plus interest at the legal rate from 13mar13, until paid in full, for Unfair and Deceptive Trade Practices, and that Defendants be held jointly and severally liable.

6. Entry of an order awarding Plaintiff the costs of this action and Plaintiff's reasonable attorney's and collection fees.

7. That Plaintiff be granted a trial by jury on all issues so triable; and

8. Entry of an order awarding Plaintiff any other remedy that the Court deems just and equitable under the circumstances.

**_Signature and Verification:_**



**James A. Kelley - 6may14**

# List of Exhibits

| Exhibit | Description | Pages |
|---------|-------------|-------|
| One | Temporary Contract | 11 |
| Two | Plaintiff's 28jan13 memo | 1 |
| Three | Reeves 1feb13 letter | 1 |
| Four | Plaintiff's 15feb13 notice | 2 |
| Five | Plaintiff's 13mar13 default notice | 5 |
| Six | Reeves 20mar13 letter | 1 |
| Seven | Plaintiff's Notice & Lien Copies | 5 |
| Eight | Ahoskie Lis Pendens | 1 |
| Nine | Northampton Lis Pendens | 1 |
| Ten | Southampton Lis Pendens | 1 |

Case 7:14-cv-00126-BO   Document 1-4   Filed 06/12/14   Page 17 of 46   EXHIBIT 2



J.A Kelley <titusranch@gmail.com>

## Fw: Jim Kelly

2 messages

**Kerry Yeager** <kerry.yeager@envivabiomass.com>                    Fri, May 4, 2012 at 8:19 AM
To: Jim Kelley <jak3@brownfieldengineering.com>, Jim Kelley <jak3@titusranch.com>

Jim,

The 1099 concept is OK. Anything else I need to chase down?


All the best.

Kerry Yeager
Enviva LP
7200 Wisconsin Ave.
Suite 1100
Bethesda Md. 20814
Phone: 1 301 657 5560 x 140
Fax: 1 301 657 5567
Cell: 1 571 426 5506

*Sent from my Verizon Wireless Phone*


-----Original message-----

**From:** Diane Klein <diane.klein@envivabiomass.com>
**To:** Kerry Yeager <kerry.yeager@envivabiomass.com>
**Sent:** Fri, May 4, 2012 12:11:59 GMT+00:00
**Subject:** RE: Jim Kelly

Yes. I left you a voice mail last night saying you could go ahead and do this at a rate of $65 per hour.

I have a contract and some paperwork I need to get together for you today.


Diane

_____

**From:** Kerry Yeager
**Sent:** Friday, May 04, 2012 8:11 AM
**To:** Diane Klein
**Subject:** Jim Kelly

EXHIBIT ONE

Case 7:14-cv-00126-BO   Document 1-4   Filed 06/12/14   Page 18 of 46 EXHIBIT 2

1 of 2                                                                          8/9/2013 1:55

Diane,

Are we good to go on Kelly being a 1099 employee until july 1?

This seems to be the last question and I want him to come to meetings next week if we can get it done.


All the best.

Kerry Yeager
Enviva LP
7200 Wisconsin Ave.
Suite 1100
Bethesda Md. 20814
Phone: 1 301 657 5560 x 140
Fax: 1 301 657 5567
Cell: 1 571 426 5506

*Sent from my Verizon Wireless Phone*


CONFIDENTIALITY NOTICE:
The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon, this information. If you received this transmission in error, please contact the sender and destroy all printed copies and permanently delete the material from all electronic storage devices including server based archives and metabases.

---

**Jim Kelley** <jak3@titusranch.com>                                                          Fri, May 4, 2012 at 8:36 AM
To: Kerry Yeager <kerry.yeager@envivabiomass.com>, Diane Klein <diane.klein@envivabiomass.com>

Diane-

Please see attached the engagement letter prepared for the 1099 assignment- revised to reflect the $65/hourly rate (vs. the prior weekly rate). The payment terms and dates remain the same.

I'd like this incorporated / attached into any added paperwork that you might need me to execute during this phase.

Regards and Thanks-

Jim Kelley
910.554.3083
[Quoted text hidden]

📄 **KE 2012.06 Enviva Engagement 4may12a.pdf**
   26K

# K<sup>e</sup>

**Mr. Kerry Yeager**
Executive Director – Capital Projects
Enviva LP
7200 Wisconsin Avenue – Suite 2100
Bethesda, MD 20814

**4may12**
by e-mail

## Re: KE #2012.06 Engagement Letter – Project Management – Enviva Pellet Mill – South Hampton County, VA

Kerry:

This is an engagement letter for James A. Kelley III, PE to serve as Enviva LP's ("Enviva") acting Project Manager for a Wood Pellet Mill to be built in the town of Franklin in the County of South Hampton in Virginia (the "Mill"). Reporting to Mr. Yeager and subject to Mr. Yeager's instructions - Kelley shall have overall responsibility and authority with regard to the design, procurement and construction of the Mill. Kelley will be supported by a project staff yet to be determined.

Kelley shall perform as follows:

A- The Term of this Agreement is to begin on 7may12 and continue through 30jun12- unless extended in writing by mutual agreement of Enviva and Kelley.

B- Kelley shall be compensated at a rate of $65 per hour. For the term period there are a total of 8 weeks for a minimum total contract value of $20,800. Kelley shall invoice on the 15th and 30th of each month for services performed and expenses incurred in the preceding periods. Enviva shall make payment to Kelley not later than 5 days after email invoice delivery.

C- Kelley's Project Management services shall be as directed by Mr. Kerry Yeager. Initially Kelley's shall be required to travel to Enviva's consultants offices at Cary, NC (MidSouth Engineering and Century Contractors) and to Franklin, VA (Mill site). When not traveling, Kelley shall perform services from his office in Swansboro, NC.

D- Travel from Swansboro, NC shall be reimbursed at the applicable GSA/IRS per diem rate:
    Cary, NC:    Room & Board = $91/day   Meals & Exp = $66/day   Total = $157/day
    Franklin, NC  Room & Board = $77/day   Meals & Exp = $46/day   Total = $123/day

There shall not be a per diem reimbursement for Room & Board – if no overnight stay is incurred.
There shall not be a per diem reimbursement for Kelley's services from Swansboro, NC
Additional Travel locations will be the applicable GSA/IRS City or Standard Rate.

Unless – Enviva provides a company vehicle for Kelley's use – all miles traveled shall be reimbursed at the current GSA/IRS rate of $0.555 per mile. Kelley shall keep a log of all miles traveled for Enviva's review if requested. In the event that Enviva provides Kelley with a company vehicle – Kelley will be reimbursed for the actual fuel used and documented.

E- Subject to the terms of a separate agreement, the parties contemplate that Kelley may become an employee of Enviva, LP. This agreement will terminate automatically should Kelley become an employee of Enviva LP. Enviva shall supply Kelley with a suitable laptop computer, accessories and software to be determined with Mr. Yeager.

800.894.5002

EXHIBIT 2

# K^e

F- Under this Agreement, Kelley will provide evidence of commercial general liability insurance and statutory vehicle liability insurance. Enviva will indemnify, defend and hold harmless – Kelley for Project Management Services under this agreement except in the case of gross negligence by Kelley.

G- Payment will be due according to Standard Kelley Terms & Conditions and the following schedule:

| | |
|---|---|
| Retainer and Advanced Expenses – due upon signing- | *$2600 – credited against final expenses.* |
| 15may12 | Not Less Than (NTL) $2600 – plus any expenses |
| 30may12 | NTL $5200 – plus any expenses |
| 15jun12 | NTL $5200 – plus any expenses |
| 30jun12 | NTL $7800 – plus any expenses – *less $2600* |
| retained | |

This proposal is valid until 7may12.

Please sign below to confirm acceptance and kindly send a check for $2600.

We greatly appreciate the opportunity to serve you.


James A. Kelley III, PE

jak3@brownfieldengineering.com


Acceptance:

_____

      Kerry Yeager – Executive Director          Date

# Standard Terms and Conditions for Each Contract

## 1. DEFINITIONS
(a) "Agreement" shall mean the Professional Services Agreement ("PSA") and any subsequent Project Scope of Work, schedules and exhibits, as necessary to the Project.
(b) "Deliverables" shall mean all reports, drawings, calculations, information, materials, media and/or other items to be provided in connection with, or as a result of, the Services specified in the Project Scope of Work.
(c) "Services" shall mean the services to be performed by KE in accordance with a Project Scope of Work, which shall include any Deliverables.
(d) "Project Scope of Work" ("PSW") shall mean the description of KE's Services and Deliverables.

## 2. DUTIES
2.1. Project Scope of Work. KE shall perform the Services in accordance with this Agreement. Each Project Scope of Work shall become effective on the date specified, and shall continue until completion of the Services described in such Project Scope of Work, unless earlier terminated in accordance with this Agreement.
2.2. KE Personnel. As defined under the PSW.
2.3. Independent Contractors. KE is an independent professional contractor and not an employee of the Client.
2.4. Project Management. As defined under the PSW.
2.5. Timeliness of Performance. As defined under the PSW. KE shall use reasonable best efforts to meet the delivery dates as set forth by the Client, but makes no representation or warranty that the Client's desired schedule can be met.
2.6. Escalation. Not applicable.
2.7. Place for the Services. All KE services will be performed at KE facilities.
2.8. Intellectual Property. All engineering design and related construction services and detailing shall remain the property of KE.

## 3. PAYMENT AND TAXES
3.1. Fees. The deposit required by the Agreement, must be paid prior to the start of work. The balance of fees for the Services (the "Fee") shall be progress invoiced at the end of each Month and due upon issuance. In the case of multiple assignments, each shall be invoiced separately. The Client will pay charges based on the time and cost required in KE's discretion to perform the Services. The charges will be calculated using the KE Standard Rates (attached) or as stated in the applicable PSW if modified.
3.2. Travel and Out-of-Pocket Expenses. See the applicable Agreement or PSW.
3.3. Taxes. Each party will be responsible for taxes assessed with their work. KE shall pay no taxes or assessments for the project or property.
3.4. Payment. KE's invoices will conform to the reasonable requirements communicated from time to time to KE by the Client. Invoices issued are payable by ACH or company check within five (5) days of receipt. Unpaid balances are changed a monthly interest rate of 1.5%. Payment is not contingent on Client's Project success, financing or completion.
3.5. Other Charges. The Client shall reimburse KE for third party services and subcontractors required to complete the work, including but not limited to third party data acquisition services at cost + 10%. See the applicable Agreement and/or PSW for individual project assignment charges. Collection costs, including accounting, noticing and legal costs will be invoiced and recovered at direct cost.

## 4. TRAINING- See the applicable PSW.

## 5. ACCEPTANCE- See the applicable PSW.

## 6. WARRANTY
6.1. KE hereby represents and warrants to the Client that:
(a) KE has the right to enter into the Agreement, and provide the Services;
(b) the Services shall be performed in a competent, professional, workman-like manner, in accordance with current industry standards;
(c) KE's personnel performing the Services hereunder shall be qualified to perform the tasks and functions which they are assigned;

## 7. DESIGN DOCUMENTS AND WORK PRODUCTS
7.1. Except as may be expressly provided within, all rights, title and interest in and to the Deliverables, in any form, and including any patents, copyrights, trade secrets, proprietary works and other intellectual and industrial property rights therein, shall vest in KE.
7.2. Reserved.

## 8. CONFIDENTIALITY
8.1. Confidential Information. Each party acknowledges that, during the term of this Agreement, it may be exposed to certain confidential and/or proprietary information and materials regarding the other party's business, including but not limited to information concerning a party's technology, customers and suppliers, which is identified in writing as confidential or proprietary at the time of disclosure ("Confidential Information").
8.2. Exclusions. However, Confidential Information shall not include any information or material which:
(i) is in (or comes into) the public domain, provided it came into the public domain through no fault of

5/11

Case 7:14-cv-00126-BO   Document 1-4   Filed 06/12/14   Page 22 of 46  EXHIBIT 2

K<sup>e</sup>

## *Standard Terms and Conditions for Each Contract*

the receiving party; (ii) can be demonstrated to have been independently developed by the receiving party without reference to the Confidential Information; (iii) is rightfully received by the receiving party from a third party not under an obligation of confidence to the disclosing party with respect thereto; or (iv) is required by law or regulation to be disclosed, but then only to the extent of such required disclosure and under confidentiality to the extent reasonably possible.

8.3. Restrictions. Each party will: (i) use a reasonable standard of care to protect Confidential Information, (ii) not use Confidential Information except as permitted by the party disclosing such Confidential Information, (iii) not disclose Confidential Information except to its employees or representatives to whom disclosure is necessary to effect the purposes of this Agreement, and who are similarly bound to hold the Confidential Information in confidence; and (iv) not reproduce Confidential Information without the disclosing party's prior written consent.

**9. INDEMNITY–** The Client shall be responsible for the defense of both parties in the event of any claim, legal proceeding or demand related to the work and the related invoices. The Client shall have an obligation to protect, indemnify and hold KE harmless under this agreement. This indemnity shall be continuing after the completion of the Services.

### 10. LIMITATION OF LIABILITY and INSURANCE
10.1    In no event shall KE be liable on any particular Project for more than that Project Fee for the specific Project under this Agreement.
10.2  The Client agrees to cover, protect and indemnify KE under Client's insurance plans and resources against any and all claims during the performance of the work and various project assignments including reimbursement for legal expenses and court costs.

### 11. TERM & TERMINATION OF THE AGREEMENT
11.1. Term. This Agreement shall begin on the Effective Date, and continue until the Project Services have been completed and fully paid.
11.2. Termination for Cause. Either party may terminate this Agreement if: (a) the other party breaches any material term of this Agreement, and fails to remedy such breach within thirty (30) days of receiving notice to do so by the non-defaulting party, or (b) in the event that the other party becomes insolvent, makes a general assignment to creditors, has a receiver appointed or files a petition in bankruptcy.
11.3. Termination for Non-Payment. KE may terminate this Agreement if the Client fails to pay any invoice within ten (10) business days of receiving notice to do so by KE.

**12. STANDARDS.** KE shall perform its engineering work according to applicable national and state standards.

### 13. GENERAL
13.1. Independent Contractors. KE and the Client are independent contractors and neither party will act as the legal agent of the other or otherwise cause the other to incur liability in any manner whatsoever.
13.2. Assignment. This agreement is not assignable or transferable.
13.3. Waiver. No waiver by either party of any delay, default or omission by the other party shall affect or impair the rights of the non-defaulting party in respect of any subsequent delay, default or omission of the same or different kind.
13.4. Force Majeure. Neither party shall be deemed to failure perform its obligations resulting from ("Force Majeure"). Each party will use its best efforts to anticipate such delays and failures, and to devise means to eliminate or minimize them.
13.5. Notice. All notices, demands or requests required or hereunder shall be deemed property given when sent in writing to the designated representative of the other party at the addresses set out above, or such other address as a party may from time to time advise, by way of either:
(a)  registered first class mail, return receipt requested;
(b)  commercial courier, return receipt requested;
(c) personal delivery; Notices shall be deemed received when physically received by the recipient.
13.6. Severability. The provisions of this Agreement shall be severable. If any provision of this Agreement shall be held unenforceable by any court of competent jurisdiction, it shall be severed from this Agreement and the remaining provisions shall remain in full force and effect.
13.7. Applicable Law. This Agreement shall be governed by the laws in force in the State of North Carolina (except for its conflict of laws provisions)and shall be adjudicated in North Carolina. The remedies specified in the Agreement will not be considered the sole remedies of the parties.
13.8. Mediation, Arbitration and Attorney's Fees. The parties must first attempt mediation and/or arbitration by a mutually agreeable neutral referee prior to undertaking any litigation. The cost of the mediation and/or arbitration shall be paid in equal shares by the parties. Formal legal proceedings and/or litigation may only be undertaken if the neutral referee finds that the parties can not find a resolution or settlement of their disagreement. If litigation or other judicial or administrative action is commenced between the parties concerning any dispute arising out of or relating to this Agreement, the prevailing party in the action and related proceedings will be entitled, in addition to any other award that may be made, to recover all court costs or other official costs and all reasonable expenses, including reasonable attorney's fees.
13.9. Reserved.

-END OF TERMS AND CONDITIONS-

Case 7:14-cv-00126-BO   Document 1-4   Filed 06/12/14   Page 23 of 46   EXHIBIT 2

 **ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 5/4/2012 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| BusinessInsuranceNow<br>1301 Central Expy. South, Suite 115<br>Allen, TX 75013 | PHONE (A/C, No, Ext): (800) 655-1714 | | FAX (A/C, No): (972) 390-8484 |
| | E-MAIL ADDRESS: | | |
| | PRODUCER CUSTOMER ID #: | | |

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| INSURED | INSURER A : The Hartford | 30104 |
| Kelley Engineering<br>PO Box 624<br>Swansboro, NC 28584 | INSURER B : Liberty Insurance Underwriters | 19917 |
| | INSURER C : | |
| | INSURER D : | |
| | INSURER E : | |
| | INSURER F : | |

| COVERAGES | CERTIFICATE NUMBER: | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | **GENERAL LIABILITY**<br>✓ COMMERCIAL GENERAL LIABILITY<br>☐ CLAIMS-MADE ✓ OCCUR<br>_____<br>_____<br>GEN'L AGGREGATE LIMIT APPLIES PER:<br>✓ POLICY ☐ PRO-JECT ☐ LOC | | Yes | 46SBMBL2879 | 8/17/2011 | 8/17/2012 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 1,000,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | | | | | | | $ |
| A | **AUTOMOBILE LIABILITY**<br>☐ ANY AUTO<br>☐ ALL OWNED AUTOS<br>☐ SCHEDULED AUTOS<br>✓ HIRED AUTOS<br>✓ NON-OWNED AUTOS | | Yes | 46SBMBL2879 | 8/17/2011 | 8/17/2012 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | ☐ UMBRELLA LIAB ☐ OCCUR<br>☐ EXCESS LIAB ☐ CLAIMS-MADE<br>☐ DEDUCTIBLE<br>☐ RETENTION $ | | | | | | EACH OCCURRENCE | $ |
| | | | | | | | AGGREGATE | $ |
| | | | | | | | | $ |
| | | | | | | | | $ |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y / N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | N / A | | | | | WC STATU-TORY LIMITS ☐ OTH-ER ☐ | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| B | Professional Liability (Errors and Omissions) | | | AEA100569-0001 | 12/13/2011 | 12/13/2012 | Occurrence / Aggregate | $1,000,000 / $1,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

Certificate Holder is named as Additional Insured with regard to the general liability

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Enviva, LP<br>7200 Wisconsin Avenue – Suite 2100<br>Bethesda, MD 20814 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE<br>*James Cochran* |

© 1988-2009 ACORD CORPORATION. All rights reserved.

ACORD 25 (2009/09)    7/11    The ACORD name and logo are registered marks of ACORD

## INDEPENDENT CONTRACTOR
## AGREEMENT

**THIS INDEPENDENT CONTRACTOR AGREEMENT** (the "*Agreement*") is made effective as of May 7, 2012, by and between Enviva, LP (the "*Company*"), whose principal place of business is located at 7200 Wisconsin Ave Suite 1100 Bethesda, MD 20814 and James A. Kelley III, PE of Swansboro, NC ("*Contractor*").

### WITNESSETH:

**WHEREAS,** the Company desires to engage the Contractor to perform certain services for the Company as an independent contractor, pursuant to the terms and conditions stated in this Agreement.

**NOW, THEREFORE,** for and in consideration of the mutual covenants and promises hereinafter set forth by the parties hereto to be faithfully performed, the Company and Contractor agree as follows:

1. **Services to be Rendered.** The Company hereby retains the Contractor as an independent contractor to engage in such activities and responsibilities as the Company may from time to time designate during the term of this Agreement (the "*Services*"), and Contractor hereby agrees to be retained by the Company to perform such Services. The Services will include, but not be limited to, the duties and responsibilities as described in Attachment A entitled "Jim Kelley Temporary Contract – Services Description".

2. **Contractor's Performance.** Contractor will use Contractor's best efforts in performing the Services. Contractor warrants that Contractor's Services hereunder will be of a professional quality conforming to the highest professional standards and shall be performed in a timely manner and to the Company's reasonable satisfaction. Contractor will work in accordance with mutually agreed upon technical specifications. Contractor has and hereby retains full control of, and supervision over, the details, manner and means by which the Contractor performs the Services and full control over any persons employed by Contractor for performing the Services hereunder. Company will not instruct the Contractor as to how the work will be performed. The Company will not provide any training for the Contractor or Contractor's employees. Contractor is expressly free to perform services for other parties while performing services for the Company.

3. **Status Reports.** Contractor agrees to complete and submit such status reports as the Company may reasonably request from time to time.

4. **Compensation.** The Company agrees to pay Contractor a fee for the performance of such consulting Services at the rate of $65 per hour. Contractor will submit an bi-weekly (twice monthly) invoices to the Company in a form satisfactory to the Company within three (3) business days after rendering any Services. Any undisputed invoice shall be paid within five (5) business days of its receipt by the Company.

5. **Expense Reimbursement.** The Company agrees to reimburse Contractor for any reasonable documented travel expenses incurred during the course of performing the Services, including but not limited to transportation, lodging and meals, which expenses, to the extent possible, shall be pre-approved by the Company. The Contractor shall include its Expenses Reimbursement request on the Invoices referenced in section 4 of this Agreement.

6. **Nature of Independent Contractor Relationship.** Contractor and the Company hereby affirm that Contractor is an independent contractor and not an employee of the Company, and agree that neither Contractor nor any person Contractor engages and uses in connection with the performance of the Services will at any time become or be considered an employee of the Company for any purpose. Contractor will make no claims, demands or applications or have any right or privilege of an employee of the Company, nor shall Contractor apply for or in any way seek or be entitled to any employee benefits including without limitation, worker's compensation coverage, health, disability or medical insurance, unemployment insurance benefits, social security coverage, pension, 401(k) or retirement plans, long-term incentive plan, bonus plan, stock option or stock-based compensation plans, or the like, to which the Company is a party or to which the Company contributes. The Contractor is obligated to pay federal and state income tax on any monies paid pursuant to this Agreement and Contractor shall satisfy all tax and other governmentally imposed responsibilities including, but not limited to, payment of social security taxes, workers' compensation, self-employment taxes, and other payroll taxes, and agrees to indemnify and hold harmless the Company from any and all liability that might be assessed against the Company for Contractor's failure to pay such taxes or other amounts when due.

7. **No Agency or Authority.** Contractor, as an independent contractor, agrees that Contractor shall not hold himself out to any party as representing the Company in any employee or agency relationship, unless specifically authorized in writing by the Company. Contractor acknowledges that Contractor has no authority to act for or on behalf of the Company other than as outlined in Attachment A.

8. **Insurance.** Contractor, as an independent contractor, shall at all times during the term of this Agreement, at Contractor's sole cost and expense, maintain general liability insurance (against damage and/or injury to person and property covering its personnel and its obligations to Company), workers compensation insurance (as required by law), and umbrella insurance, with limits acceptable to the Company. Contractor shall furnish the Company with a certificate of insurance showing such coverage and naming the Company as an additional insured, with respect to the general liability insurance, for the duration of the Agreement. Contractor and Contractor's personnel, if any, will abide by the rules of Company and will at all times conduct themselves in an ethical manner and comply with applicable federal, state and local laws and regulations when performing the Services contemplated hereunder. Contractor acknowledges that there are risks, hazards and dangers associated with the provision of Services hereunder and knowingly and willingly assumes such risks, hazards and dangers.

9. **Indemnification**. Contractor shall defend, indemnify and hold Company, its parents, affiliates, subsidiaries, and its and their respective partners, officers, directors, members, managers, agents and employees harmless against any and all claims, damages, or liabilities, including attorneys' fees and other legal expenses, arising directly or indirectly from Contractor's performance of the Services provided hereunder, including but not limited to the negligent or wrongful acts or omissions of Contractor or Contractor's agents or employees. Contractor waives, releases, and shall indemnify, defend, and hold harmless the Company for, against and from any claims for which the Contractor was required to obtain insurance pursuant to this Agreement.

10. **Ownership of Information and Work Product**. All files and documents produced or accumulated by Contractor will become and remain the property of the Company and Contractor will turn them over to the Company at the expiration or termination of this Agreement. Contractor waives any rights Contractor may assert to such property. All matters, information, knowledge and know-how coming to the attention of Contractor in the course of the Services performed under this Agreement shall be the exclusive property of the Company, and Contractor shall, upon request, assign, transfer and set over exclusively to the Company Contractor's entire right, title and interest in any and all such information or

9/11

intellectual property. All work by Contractor hereunder will be deemed "work for hire" for purposes of conferring on the Company all ownership rights in intellectual property arising out of or relating to such work.

11.    **Term and Termination**. This Agreement will become effective upon execution by both parties and shall terminate upon the earlier of June 30, 2012, or immediately upon ten (10) days prior written notice by either party to the other party provided that any termination by the Company shall be for cause. In addition, if the Contractor is convicted of any crime or offense, fails or refuses to comply with the lawful written policies or reasonable directives of the Company, is guilty of serious misconduct in connection with performance hereunder, or materially breaches this Agreement, the Company at any time may terminate the engagement of the Contractor immediately and without prior written notice to the Contractor.

12.    **Disclosure of Conflicts of Interest**. During the term of this Agreement, Contractor agrees to immediately disclose to the Company any relationship with a person, entity or enterprise that is or may be competitive with the business, technology, or products of the Company for whom Contractor is performing an assignment. The Company may terminate this Agreement immediately if it finds, in its sole discretion, that any such relationship represents an unacceptable conflict of interest.

13.    **Non-Disclosure of Confidential or Proprietary Information**

(a)    For purposes of this Agreement, "Confidential Information" means information in whatever form disclosed by the Company, including without limitation, customer information, business, financial and technical materials, information and data, or which although not directly related to the relationship between Company and Contractor is nevertheless disclosed as a result of or in connection with the parties' discussions and objectives.

(b)    Contractor shall use the Confidential Information solely for the purposes of performing the Services hereunder, and shall protect such Confidential Information from disclosure to third parties, using the highest degree of care. Confidential Information will not be copied, in whole or in part, except as necessary for performance of Services as authorized hereunder.

(c)    The confidentiality and non-disclosure obligations of the previous paragraphs shall not apply if, and to the extent that:

(i)    Contractor can demonstrate to Company's satisfaction that the Confidential Information was known to the Contractor prior to Contractor's receipt from the Company;

(ii)    The Confidential Information is or becomes part of the public domain other than by the fault of the Contractor;

(iii)    Such Confidential Information is independently developed by the Contractor without access to Confidential Information, as evidenced by Contractor's written records; or

(iv)    Disclosure is required by a judicial order or decree of governmental law or regulation, provided that Contractor promptly notifies the Company of such requirement and reasonable opportunity is allowed by Contractor for the Company to file for or obtain a protective order or otherwise proceed for protection under applicable law.

14.     **Assignment.** This Agreement provides for the performance of personal services by Contractor and, accordingly, Contractor may not assign this Agreement or any of Contractor's interests hereunder or delegate any duty or responsibility incurred by Contractor hereunder to another. The Company, at any time and without the consent of Contractor, may assign or transfer, for such consideration and on such terms and conditions as it may deem appropriate, this Agreement and all of its interests hereunder and no such assignment or transfer by the Company shall in any manner restrict, limit or modify the interests, duties and responsibilities of Contractor under this Agreement.

15.     **Applicable Law.** This Agreement is governed by the laws of the State of New York, without regards to its conflicts of laws principles.

16.     **Waiver of Jury Trial.** The Company and Contractor each hereby knowingly, voluntarily, and intentionally waive any and all rights that they may have to a trial by jury with respect to any litigation based hereon, or arising out of, under, or in connection with this agreement, any course of conduct, course of dealing, statements (oral or written), or actions of the Company or Contractor. This provision is a material inducement for the Company and Contractor entering into this Agreement.

17.     **Miscellaneous.** This Agreement is the complete agreement between the parties regarding the subject matter hereof and supersedes all prior understandings and negotiations, oral and written, on the subject matter hereof. It is understood and agreed that no failure or delay by a party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege hereunder. The invalidity or unenforceability of any provision or provisions of this Agreement or portions thereof shall not affect the validity of any other provision, or portion of this Agreement, which shall remain in full force and effect as if executed with the unenforceable or invalid provision, or portion thereof, eliminated. This Agreement may be executed in one or more counterparts and each executed copy shall constitute an original, but all counterparts shall be deemed one and the same instrument and this Agreement shall not be modified or waived, except in writing, signed and acknowledged by the parties hereto. This Agreement may be executed by facsimile or electronic signature pages which shall have the same force and effect as original executed signature pages.


        IN WITNESS WHEREOF, Company and Contractor have executed this Independent Contractor Agreement, each as his, her or its own free act and deed.

**Kelley Engineering**                                    **ENVIVA, LP**

By: _____                    By: _____

Printed Name: _____ James A. Kelley               Printed Name: _____ Kerry Yeager

Its: _____ Partner _____                                  Its: _____ Executive Director

Date: _____ 7 May 12 _____                          Date: _____

$K^E$

## Hold on Enviva Work

---

**Jim Kelley** <jak3@brownfieldengineering.com>                                   Mon, Jan 28, 2013 at 4:25 PM
To: Norb Hintz <norb.hintz@envivabiomass.com>
Bcc: private

Norb:

Based on our brief telephone call this weekend, I understand from you that Enviva's preference is to assume the Project Management role for which we contracted for at the Franklin, VA Enviva project.
My understanding is Enviva has made this choice due to altered conditions within the company and to manage the design subcontractor - Midsouth Engineering.
As Kerry, you and I have discussed on multiple occasions - there remain from MSE -habitual deficiencies in performance and errors in engineering affecting schedule, economy and quality which have been clearly called out..
These deficiencies continue to jeopardize the Project's cost and schedule- despite our best efforts. Efforts and work which has saved Enviva at least $3mm - to date - in comparison with NOR.
While I agree that it is best that Enviva should be directly responsible for Midsouth due to their documented intransigence and duplicity, I do not think that your assumption of site management is wise at this time.

Never the less, I am standing by- while Enviva sorts out its transition plan.
This week I will work from my Swansboro NC office while awaiting your instructions.
As you know- there are a large number of agreements and subProjects - in the critical stages of final consummation.
Despite this - my understanding is that you have asked me to standby - pending your plan.

Later today - I will send a short log of all of the more critical activities / contracts in motion - and the necessary actions needed/recommended in the next 7 to 10 days.
I suggest that Enviva develop a responsibility matrix to transition the many, many activities that we've been managing.
I don't want to see Enviva drop the ball for Southampton.

Whilst it is Enviva's prerogative to manage facility development according to your own strategy and convenience- we do not agree with this dramatic change without notice, warning or planning- which is likely to be detrimental to Project execution. We do expect Enviva to honor it's commercial obligations and make us whole. As per prior agreement - 100% of my available time - through oct13 - has been dedicated solely to Enviva's projects and benefit. It is my understanding that we are in agreement - that we will segregate technical & logistical assistance/transition - from commercial discussions- predicated upon and in anticipation of an amicable process of transition. I look forward to your proposal in this regard.

Please provide written instructions on how to proceed.
As you know - I receive numerous calls - 20+ - each day regarding this project - and it's management- to which I have been wholly committed..
We need a consistent "public story" to mitigate. I am very concerned about the preservation of respective names and reputations.

Regards

Jim Kelley, PE
910.554.3083

---

SWANSBORO, NC - BLOOMSBURY - NJ- 08804
800.894.5002

Case 7:14-cv-00126-BO   Document 1-4   Filed 06/12/14   Page 29 of 46   EXHIBIT 2



Stephen F. Reeves
Executive Vice President & CFO

7200 Wisconsin Ave, Suite 1100
Bethesda, MD 20814 USA

+1 (240) 482 3787

fax (301) 657 5567

February 1, 2013

Mr. James A. Kelley III, P.E.
Kelley Engineering
P.O. Box 624
Swansboro, NC 28584

*By E-mail and Certified Mail*

rec'd 6Feb13
JAK3

Dear Mr. Kelley:

As conveyed to you by Norb Hintz on Saturday January 26, 2013, your engagement with Enviva LP terminated on that date.

Since you will no longer be providing services to Enviva, we would like to reconcile any outstanding accounts. Therefore, please provide me with a final invoice no later than February 15, 2013 that sets forth all outstanding sums that you assert Enviva owes you for services rendered. We will then promptly pay all undisputed sums within five days of our receipt of that invoice. We are in receipt of your December invoice and are currently processing it for payment.

Please be reminded that all documents (including e-mails and other electronically stored information), files and other materials produced or accumulated by you in the course of your engagement with Enviva remain the property of Enviva and must be returned to the company. When providing the above-described invoice, please confirm that you have returned all such materials.

If you have any questions, do not hesitate to contact me.

Sincerely,

Stephen F. Reeves
Executive Vice President and CFO

EXHIBIT THREE

# K$^E$

**Mr. Stephen Reeves**
CFO
Enviva LP
Enviva Pellets – Ahoskie, Northampton & Southampton – LLC's
7200 Wisconsin Ave, Suite 1100
Bethesda, MD 20814

**15feb13**
Via USPS Priority

Re:                    Enviva – K/E contract

Mr. Reeves:

On 6feb13 I received your letter notifying of Enviva's preference to terminate our contract(s) for Enviva's convenience. Please find attached, for your convenience, our correspondence with Mr. Norb Hintz from the week preceding receipt of your letter. As you know, based on the promises and commitments of Enviva's leadership, we have almost totally committed our resources through Nov13 to the success of Enviva. Enviva's decision comes as quite a devastating surprise.

I suggest that we schedule a brief conference call – seeking to resolve the following outstanding issues:

1- Specific identification and agreement over what constitutes: Enviva material; K/E material and what shall remain proprietary / confidential – respectively for each party.

2- Agreement on any restrictive and/or non-competition agreements that Enviva would like to secure.

3- Commercial resolution of all outstanding fees, charges and claims.

Please advise of some preferred dates and times as soon as practical, so that we can conclude business amicably. I can be reached at: **910.554.3083** or by confirmed email at:   **jak3@brownfieldengineering.com**

Regards,

**James A. Kelley III, PE**
Partner

SWANSBORO,  NC  -  BLOOMSBURY – NJ- 08804
800.894.5002

EXHIBIT

1/2

Case 7:14-cv-00126-BO   Document 1-4   Filed 06/12/14   Page 31 of 46

EXHIBIT 2

# $K^E$

## Hold on Enviva Work

---

**Jim Kelley** <jak3@brownfieldengineering.com>                                    Mon, Jan 28, 2013 at 4:25 PM
To: Norb Hintz <norb.hintz@envivabiomass.com>
Bcc: private

Norb:

Based on our brief telephone call this weekend, I understand from you that Enviva's preference is to assume the Project Management role for which we contracted for at the Franklin, VA Enviva project.
My understanding is Enviva has made this choice due to altered conditions within the company and to manage the design subcontractor - Midsouth Engineering.
As Kerry, you and I have discussed on multiple occasions - there remain from MSE -habitual deficiencies in performance and errors in engineering affecting schedule, economy and quality which have been clearly called out..
These deficiencies continue to jeopardize the Project's cost and schedule- despite our best efforts. Efforts and work which has saved Enviva at least $3mm - to date - in comparison with NOR.
While I agree that it is best that Enviva should be directly responsible for Midsouth due to their documented intransigence and duplicity, I do not think that your assumption of site management is wise at this time.

Never the less, I am standing by- while Enviva sorts out its transition plan.
This week I will work from my Swansboro NC office while awaiting your instructions.
As you know- there are a large number of agreements and subProjects - in the critical stages of final consummation.
Despite this - my understanding is that you have asked me to standby - pending your plan.

Later today - I will send a short log of all of the more critical activities / contracts in motion - and the necessary actions needed/recommended in the next 7 to 10 days.
I suggest that Enviva develop a responsibility matrix to transition the many, many activities that we've been managing.
I don't want to see Enviva drop the ball for Southampton.

Whilst it is Enviva's prerogative to manage facility development according to your own strategy and convenience- we do not agree with this dramatic change without notice, warning or planning- which is likely to be detrimental to Project execution. We do expect Enviva to honor it's commercial obligations and make us whole. As per prior agreement - 100% of my available time - through oct13 - has been dedicated solely to Enviva's projects and benefit. It is my understanding that we are in agreement - that we will segregate technical & logistical assistance/transition - from commercial discussions- predicated upon and in anticipation of an amicable process of transition. I look forward to your proposal in this regard.

Please provide written instructions on how to proceed.
As you know - I receive numerous calls - 20+ - each day regarding this project - and it's management- to which I have been wholly committed..
We need a consistent "public story" to mitigate. I am very concerned about the preservation of respective names and reputations.

Regards

Jim Kelley, PE
910.554.3083

---

SWANSBORO, NC - BLOOMSBURY - NJ- 08804
800.894.5002

# K$^E$

Mssrs. Stephen Reeves, Norb Hintz & David Meeker
Officers
Enviva LP
Enviva Pellets – Ahoskie, Northampton & Southampton – LLC's
7200 Wisconsin Ave, Suite 1100
Bethesda, MD 20814

**13mar13**
Via USPS & Email

Re:                    Enviva – K/E contract dispute

**Mr. Reeves:**

*Once again –Enviva's business practices- surprise and confuse us.*

We have yet to receive any information from Enviva explaining the reasons for the termination of our contract. At this point -- Enviva's actions must be classified as a breach of contract and will be handled accordingly.

So that we can prepare for further action and any coordination discussions please provide Enviva's reason(s) for termination of our Contract. Kindly provide this information- in writing not later than 20mar13.

In the mean time, we have prepared a final invoice for KE's charges through the end of the current contract – nov13. You will note that we have included a de minimis fee in the last line – in order to settle the matter without further legal action. Payment of this invoice will effectively settle the matter without further action by KE.

Please note that the statement of Enviva's accounts shows a past due balance (45+ days) which should be paid immediately.

If this matter is not resolved by 31mar13, KE will pursue collection remedies- the costs of which will be in addition to the attached invoices. Please be aware that this is an attempt to collect a debt and any information obtained will be used for that purpose.   Additionally please refer to NC G.S. 44A-23 and VA § 43 regarding this matter.

Regards,

**James A. Kelley III, PE**
Partner

EXHIBIT
FIVE

SWANSBORO, NC - BLOOMSBURY, NJ
800.894.5002

# Kelley Engineering

PO Box 624, Swansboro, NC 28584

**Billing Statement**

| Date |
|---|
| 3/13/2013 |

Client:

Enviva Biomass LP
Kerry Yeager / Norb Hintz
7200 Wisconsin Avenue
Suite 1100
Bethesda, MD 20814

| Amount Due |
|---|
| $212,770.15 |

| Date | Invoice / Description | Amount | Balance |
|---|---|---|---|
| 12/31/2012 | Balance forward | | 0.00 |
| | 2012.06 Enviva- | | |
| 01/19/2013 | INV #2012.06.11. Due 01/19/2013. | 22,211.67 | 22,211.67 |
| 01/28/2013 | INV #2012.06.12. Due 01/28/2013. | 20,942.79 | 43,154.46 |
| 02/11/2013 | PMT | -22,211.67 | 20,942.79 |
| 03/04/2013 | PMT Partial Payment Rec'd w/o explanation | -19,382.79 | 1,560.00 |
| 03/13/2013 | INV #2012.06.13. Due 03/13/2013. | 211,210.15 | 212,770.15 |

| Current | 1-30 Days Past Due | 31-60 Days Past Due | 61-90 Days Past Due | Over 90 Days Past Due | Amount Due |
|---|---|---|---|---|---|
| 211,210.15 | 0.00 | 1,560.00 | 0.00 | 0.00 | $212,770.15 |

**800.894.5002**      **www.brownfieldengineering.com**      info@brownfieldengineering.com

# Kelley Engineering

PO Box 624, Swansboro, NC 28584

# Invoice

| Date | Invoice # |
|------|-----------|
| 3/13/2013 | 2012.06.13 |

| Client |
|--------|
| **Enviva Biomass LP**<br>**Norb Hintz- SVP**<br>**7200 Wisconsin Avenue**<br>**Suite 1100**<br>**Bethesda, MD 20814** |

| Project |
|---------|
| **2012.06 Enviva** |

| Terms |
|-------|
| Due on receipt |

| Date | Hours / Quant... | Item | Description | Hourly / Unit ... | Amount |
|------|------------------|------|-------------|-------------------|--------|
| | | | ----Services apportioned based on historical averages & attributable as follows: 10% Ahoskie NC; 15% Northampton NC; 15% Enviva LP & Corporate Properties; 60% Southampton VA----- | | |
| 2/3/2013 | 27 | ProjMan | Project Management 2.5 days | 65.00 | 1,755.00 |
| 2/10/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 2/17/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 2/24/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 3/3/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 3/10/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 3/24/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 3/31/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 4/7/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 4/14/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 4/21/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 4/28/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 5/5/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 5/12/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 5/19/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 5/26/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 6/2/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 6/9/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 6/16/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 6/23/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |

PLEASE NOTE - PAST DUE BALANCES @ 1.5% MONTHLY

| **Total** | |
|-----------|--|
| **Payments/Credits** | |
| **Balance Due** | |

800.894.5002 **www.brownfieldengineering.com** info@brownfieldengineering.com

EXHIBIT 2

3/5

# Kelley Engineering

PO Box 624, Swansboro, NC 28584

# Invoice

| Date | Invoice # |
|------|-----------|
| 3/13/2013 | 2012.06.13 |

| Client |
|--------|
| **Enviva Biomass LP** |
| **Norb Hintz- SVP** |
| **7200 Wisconsin Avenue** |
| **Suite 1100** |
| **Bethesda, MD 20814** |

| Project |
|---------|
| **2012.06 Enviva** |

| Terms |
|-------|
| Due on receipt |

| Date | Hours / Quant... | Item | Description | Hourly / Unit ... | Amount |
|------|------------------|------|-------------|-------------------|--------|
| 6/30/2013 | 63 | ProjMan | Project Management 1 week | 65,00 | 4,095.00 |
| 7/7/2013 | 63 | ProjMan | Project Management 1 week | 65,00 | 4,095.00 |
| 7/14/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 7/21/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 7/28/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 8/4/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 8/11/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 8/18/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 8/25/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 9/1/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 9/8/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 9/15/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 9/22/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 9/29/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 10/6/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 10/13/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 10/20/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 10/27/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 11/3/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 11/10/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 11/17/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| 11/24/2013 | 63 | ProjMan | Project Management 1 week | 65.00 | 4,095.00 |
| | | | Reimbursable Expenses Subtotal | | 169,650.00 |

PLEASE NOTE - PAST DUE BALANCES @ 1.5% MONTHLY

| **Total** | |
| **Payments/Credits** | |
| **Balance Due** | |

# Kelley Engineering

PO Box 624, Swansboro, NC 28584

# Invoice

| Date | Invoice # |
|------|-----------|
| 3/13/2013 | 2012.06.13 |

| Client |
|--------|
| **Enviva Biomass LP**<br>**Norb Hintz- SVP**<br>**7200 Wisconsin Avenue**<br>**Suite 1100**<br>**Bethesda, MD 20814** |

| Project |
|---------|
| **2012.06 Enviva** |

| Terms |
|-------|
| Due on receipt |

| Date | Hours / Quant... | Item | Description | Hourly / Unit ... | Amount |
|------|------------------|------|-------------|-------------------|--------|
| 3/13/2013 | 189 | Per Diem - GSA | Per Diem Reimbursement (feb-nov13 @ 4.5 d/wk x 42 wk) | 66.00 | 12,474.00 |
| 3/13/2013 | 10 | Reimb Expenses | Telecom and Data Contracts for Southampton access (feb-nov13 - termination not possible) | 149.50 | 1,495.00 |
| 3/13/2013 | 1 | Reimb Expenses | Ringcentral - local numbers costs through feb13 (terminated 28feb13 without further charge) | 11.48 | 11.48 |
| 3/13/2013 | | Fin Chg | Finance Charges on Overdue Balance- $1560 jan13 | 35.10 | 35.10 |
| | | | Reimbursable Expenses Subtotal | | 14,015.58 |
| 3/13/2013 | 1 | Termination Fees | Termination / Break Up Fees - in lieu of Breech of Contract by Enviva LP and related affiliates, officers and associates (15%) | 27,544.57 | 27,544.57 |

PLEASE NOTE - PAST DUE BALANCES @ 1.5% MONTHLY

| **Total** | $211,210.15 |
|-----------|-------------|
| **Payments/Credits** | $0.00 |
| **Balance Due** | $211,210.15 |



7200 Wisconsin Ave, Suite 1100
Bethesda, MD 20814 USA

+1 (301) 657 5560
fax (301) 657-5567

www.envivabiomass.com

March 20, 2013                                    *By E-mail and Certified Mail*

Mr. James A. Kelley III, P.E.
Kelley Engineering
P.O. Box 624
Swansboro, NC 28584

Dear Mr. Kelley:

I am in receipt of your email of March 14th with attached demand letter and various invoices and statements.  Again, as conveyed to you by Norb Hintz on Saturday January 26th, 2013, and reiterated in my letter of February 1, 2013, your engagement with Enviva LP terminated on January 26th, 2013.  Your engagement was terminated for cause.

We have paid you for your time through January 26th as documented in your January invoice to us. We have not directed you to perform any services for us from that time and accordingly you are not due any further compensation from us.

Please be reminded that all documents (including e-mails and other electronically stored information), files and other materials produced or accumulated by you in the course of your engagement with Enviva remain the property of Enviva and must be returned to the company.

If you have any questions, do not hesitate to contact me.

Sincerely,

Stephen F. Reeves
EVP and CFO

EXHIBIT SIX



# K<sup>E</sup>

**Mssrs. Stephen Reeves, Norb Hintz & David Meeker**
Officers
Enviva LP
Enviva Pellets – Ahoskie, Northampton & Southampton – LLC's
7200 Wisconsin Ave, Suite 1100
Bethesda, MD 20814            **23april13**
                                    Via USPS & Email

Re:                  **K/E v. Enviva, et al – Notices of Liens against Real Property**

**Mr. Reeves, Mr. Hintz & Mr. Meeker:**

Please find attached copies of the executed Mechanics Liens filed on the subject properties in North Carolina and Virginia – per to NC G.S. 44A-23 and VA § 43 as appropriate. Please be advised that these documents are required by State law and are public records. This is communication is a continuation of attempt to collect a debt. Any information obtained will be used for that purpose.

Regards,

**James A. Kelley III, PE**
Partner





### Northampton County - North Carolina
## *CLAIM OF LIEN ON REAL PROPERTY - $42,554.03*

Filed
2013 Apr. 25
Pm 4:5
Northampton Co. CSC
By _____ Deputy
CSC

(1)     Name and address of the person claiming the claim of lien on real property:
**James Kelley / KELLEY ENGINEERING - PO BOX 624, SWANSBORO, NC 28584**

(2)     Name and address of the record owner of the real property:
**ENVIVA PELLETS NORTHAMPTON LLC**
**C/O ENVIVA LP - 7200 WISCONSIN AVENUE – SUITE 1100 – BETHESDA- MD 20814**

(3)     Description of the real property upon which the claim of lien on real property is claimed:
**830 LEBANON CHURCH ROAD, GASTON, NC 27831**
**– PARCEL NO. 01-09993 IN THE MID-ATLANTIC INDUSTRIAL PARK (PIN 070003053)**

(4)     Name and address of the person with whom the claimant contracted for the furnishing of labor or materials:
**UNDER CONTRACT WITH KERRY YEAGER AND NORB HINTZ FOR ENVIVA.**

(5)     Date upon which labor or materials were first furnished upon said property by the claimant:
**CONTRACT ORIGINATING IN MAY 2012**

(5a)    Date upon which labor or materials were last furnished upon said property by the claimant:
**THROUGH LATEST DATE OF SERVICES FEBRUARY 28, 2013.**

(6)  .   General description of the labor performed or materials furnished and the amount claimed therefor:
**PROJECT DEVELOPMENT, PERMITTING, CONTRACTING, PROCUREMENT, STAFFING,**
**CONSTRUCTION MANAGEMENT AND RELATED SERVICES.**

(7)     Amount of Claim / Lien:
**$42,554.03 plus costs and fees of collection; plus interest and related charges.**

I hereby certify that I have served the parties listed in (2) above in accordance with the requirements of G.S. 44A-11.

Lien Claimant

2 3 April 13

**AFFIDAVIT**
State of North Carolina

County of ONSLOW, to wit:
I, Gina Murphy ........................, of the county aforesaid, do certify that
NOTARY OR OTHER OFFICER
KELLEY ENGINEERING, claimant, with JAMES KELLEY , as agent for claimant, this day made oath before me in my county aforesaid that ENVIVA PELLETS NORTHAMPTON, LLC, owner, is justly indebted to claimant in the sum of **$ 42,554.03** dollars, for the consideration stated in the foregoing memorandum, and that the same is payable as therein stated.
Given under my hand this 23RD day of April, 20 13

NOTARY
Registration No. ............................ My commission expires 7.26.2014

GINA MURPHY
Notary Public
Onslow County
My Commission Expires
07/26/2014
NORTH CAROLINA

Filed this ____ day of ____, ____
_____
Clerk of Superior Court

HERTFORD
~~Northampton~~ County - North Carolina

## CLAIM OF LIEN ON REAL PROPERTY - $31,915.52

FILED

13 MAY -6 AM 10: 31

HERTFORD COUNTY, N.C.

BY _____ SP

(1)    Name and address of the person claiming the claim of lien on real property:
**James Kelley / KELLEY ENGINEERING  - PO BOX 624, SWANSBORO, NC 28584**

(2)    Name and address of the record owner of the real property:
**ENVIVA PELLETS AHOSKIE LLC**
**C/O ENVIVA LP - 7200 WISCONSIN AVENUE – SUITE 1100 – BETHESDA- MD  20814**

(3)    Description of the real property upon which the claim of lien on real property is claimed:
**142 NC HWY 561 EAST – AHOSKIE – NC  27910**
**– PARCEL NO. 6902031142**

(4)    Name and address of the person with whom the claimant contracted for the furnishing of labor or materials:
**UNDER CONTRACT WITH KERRY YEAGER AND NORB HINTZ FOR ENVIVA.**

(5)    Date upon which labor or materials were first furnished upon said property by the claimant:
**CONTRACT ORIGINATING IN MAY 2012**

(5a)    Date upon which labor or materials were last furnished upon said property by the claimant:
**THROUGH LATEST DATE OF SERVICES FEBRUARY 28, 2013.**

(6)    General description of the labor performed or materials furnished and the amount claimed therefor:
**PROJECT DEVELOPMENT, PERMITTING, CONTRACTING, PROCUREMENT, STAFFING,**
    **CONSTRUCTION MANAGEMENT AND RELATED SERVICES.**

(7)    Amount of Claim / Lien:
**$31,915.52 plus costs and fees of collection; plus interest and related charges.**

    I hereby certify that I have served the parties listed in (2) above in accordance with the
    requirements of G.S. 44A-11.

Lien Claimant
23 April 13

**AFFIDAVIT**
State of North Carolina

County of ONSLOW, to wit:
I, _GINA MURPHY_ ..............................., of the county aforesaid, do certify that
    NOTARY OR OTHER OFFICER
KELLEY ENGINEERING, claimant, with JAMES KELLEY , as agent for claimant, this day made oath before me in my county
aforesaid that ENVIVA PELLETS NORTHAMPTON, LLC, owner, is justly indebted to claimant in the sum of **$ 31,915.52**
dollars, for the consideration stated in the foregoing memorandum, and that the same is payable as therein stated.
    Given under my hand this .23... day of ...April.............................., 20 .13.

_____
                NOTARY                 7.26.2014
Registration No. ................................ My commission expires ..7.26.2014

GINA MURPHY
Notary Public
Onslow County
My Commission Expires
07/26/2014
NORTH CAROLINA

    Filed this ____ day of ____, ____

_____
                Clerk of Superior Court

*ORIG*

**MEMORANDUM FOR MECHANIC'S LIEN**
**CLAIMED BY GENERAL CONTRACTOR**
**UNDER VIRGINIA CODE § 43-5**

.................................... Southampton County .................................................. Circuit Court

PO Box 190, Courtland, VA  23837 ........................... 757.653.2200
ADDRESS ......................................................... TELEPHONE NUMBER

Portion of Parcel 92 18 ............ or ............ 070003053
TAX MAP REFERENCE NUMBER ......................... PARCEL IDENTIFICATION NUMBER

Enviva Pellets Southampton, LLC
NAME OF OWNER

7200 Wisconsin Avenue - Suite 1100 - Bethesda, MD  20814
ADDRESS OF OWNER

Kelley Engineering
NAME OF CLAIMANT

PO Box 624 - Swansboro - NC  28584
ADDRESS OF CLAIMANT

1. Type of materials or services furnished:
   Project Development, Permitting, Contracting, Procurement, Staffing, Construction Management and Related Services.

2. Amount claimed: $ 138,260.60

   Type of structure on which work done or materials furnished:
   Industrial Facilities - including pilings, foundations, steel structures, machinery, equipment, utilities and roadways

   Brief description and location of real property:
   26570 Rose Valley Road, Franklin, VA 23851 within the Turner Tract Industrial site as developed by Southampton County Industrial Development Authority and/or Enviva LP together with its affiliates

   Date from which interest on the above account is claimed: ............... February 28, 2013

Case 7:14-cv-00126-BO   Document 1-4   Filed 06/12/14   Page 42 of 46   EXHIBIT 2

It is the intent of the claimant to claim the benefit of a lien. The undersigned hereby certifies to having mailed a copy of this memorandum of lien to the owner of the property at the property owner's last

known address, ................... 7700 Wisconsin Avenue - Suite 1100, Bethesda, MD 20814 ...................

ADDRESS

............................................................................... on ...................... April 23, 2013 ...........

DATE OF MAILING

............. April 23, 2013 .............                      .........................................

DATE                                                                 SIGNATURE OF CLAIMANT

**AFFIDAVIT**

State of ~~Virginia~~ NORTH CAROLINA

County ~~or City~~ of ........ Onslow .............................................................................. , to wit:

I, ...... Gina Murphy ............. , of the county (or city) aforesaid, do certify that

NOTARY OR OTHER OFFICER

.... Kelley Engineering .................... , claimant, or ......... James A. Kelley III ............. , agent

for claimant, this day made oath before me in my county (or city) aforesaid that

....... Enviva Southampton Pellets LLC ................................ , owner, is justly indebted to claimant in

the sum of $ ..... 138,260.60 ............... dollars, for the consideration stated in the foregoing

memorandum, and that the same is payable as therein stated.

Given under my hand this ... 23RD .... day of ... April ............... , 20 13 .....

Notary Public
Onslow County
My Commission Expires
07/26/2014
GINA MURPHY
NORTH CAROLINA

[ ] CLERK   [ ] DEPUTY CLERK   [X] NOTARY

Registration No. ........................ My commission expires ... 7.26.2014 ...

This instrument was admitted to record ....................................... at .........................

DATE                                                          TIME

...................................... , Clerk   by ....................................... , Deputy Clerk

INSTRUMENT #130001110
RECORDED IN THE CLERK'S OFFICE OF
SOUTHAMPTON ON
APRIL 25, 2013 AT 03:05PM

RICK FRANCIS, CLERK
RECORDED BY: HRS

James Kelley / Kelley Engineering
POB 624, Swansboro, NC 28584
V & F - 910.554.3083
PLAINTIFF

STATE OF NORTH CAROLINA

COUNTY OF ONSLOW

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO. 13-CV2-_____

James Kelley / Kelley Engineering )
                                   )
          Plaintiff,               )
                                   )
     vs.                           )            **LIS PENDENS**
                                   )
Enviva LP, John Keppler, Norb Hintz, )
Enviva Pellets Ahoskie LLC,        )
Enviva Pellets Northampton LLC,    )
Enviva Pellets Southampton LLC,    )
"John Doe" Corporation(s) and/or Partnership(s) )
                                   )
          Defendants.              )

NOTICE IS HEREBY GIVEN THAT an action has been commenced as of 9aug13 in this Court
upon complaint of the above named Plaintiff against the above named Defendant(s) to recover
damages for Breach of Contract, Account Stated with Money Owed, Breech of Implied
Covenant of Good Faith and Fair Dealing, Fraud and Unfair and Deceptive Trade Practice and to
enforce Plaintiff's lien affecting real property described as follows:

Last Owner:                    **Enviva Pellets Ahoskie LLC**
Street Address:                **142 NC HWY 561 EAST, AHOSKIE, NC  27910**
County:                        **Hertford**

Deed dated:                    **15dec10**
Deed Book                      **729 at**
Page:                          **75, et seq.**
Tax #:                         **6902-03-1142**

Submitted by Plaintiff:

_____
James A. Kelley -    9aug13

EXHIBIT EIGHT

EXHIBIT 2

James Kelley / Kelley Engineering
POB 624, Swansboro, NC 28584
V & F - 910.554.3083
PLAINTIFF

STATE OF NORTH CAROLINA

COUNTY OF ONSLOW

James Kelley / Kelley Engineering )
)
Plaintiff, )
)
vs. )
)
Enviva LP, John Keppler, Norb Hintz, )
Enviva Pellets Ahoskie LLC, )
Enviva Pellets Northampton LLC, )
Enviva Pellets Southampton LLC, )
"John Doe" Corporation(s) and/or Partnership(s) )
)
Defendants. )

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO. 13-CV2-_____

**LIS PENDENS**

NOTICE IS HEREBY GIVEN THAT an action has been commenced as of 9aug13 in this Court
upon complaint of the above named Plaintiff against the above named Defendant(s) to recover
damages for Breach of Contract, Account Stated with Money Owed, Breech of Implied
Covenant of Good Faith and Fair Dealing, Fraud and Unfair and Deceptive Trade Practice and to
enforce Plaintiff's lien affecting real property described as follows:

Last Owner:               **Enviva Pellets Northampton LLC**
Street Address:           **830 LEBANON CHURCH ROAD, GASTON, NC 27831**
County:                   **Northampton**

Deed dated:               **dec11**
Deed Book                 **461 at**
Page:                     **81, et seq.**
Tax #:                    **4000-75-4062: PARCEL NO. 01-09993 - MID-ATLANTIC INDUSTRIAL PARK**

Submitted by Plaintiff:

_____
James A. Kelley -    9aug13

EXHIBIT NINE

EXHIBIT 2

James Kelley / Kelley Engineering
POB 624, Swansboro, NC 28584
V & F - 910.554.3083
PLAINTIFF

STATE OF NORTH CAROLINA

COUNTY OF ONSLOW

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO. 13-CV2-_____

James Kelley / Kelley Engineering )
 )
   Plaintiff, )
 )
   vs. )
 )
Enviva LP, John Keppler, Norb Hintz, )
Enviva Pellets Ahoskie LLC, )
Enviva Pellets Northampton LLC, )
Enviva Pellets Southampton LLC, )
"John Doe" Corporation(s) and/or Partnership(s) )
 )
   Defendants. )

**LIS PENDENS**

NOTICE IS HEREBY GIVEN THAT an action has been commenced as of 9aug13 in this Court upon complaint of the above named Plaintiff against the above named Defendant(s) to recover damages for Breach of Contract, Account Stated with Money Owed, Breech of Implied Covenant of Good Faith and Fair Dealing, Fraud and Unfair and Deceptive Trade Practice and to enforce Plaintiff's lien affecting real property described as follows:

Last Owner:   **Enviva Pellets Southampton LLC**
Street Address:  **26570 Rose Valley Road, Franklin, VA 23851**
County:    **Southampton**

Deed dated:   **jun12**
Deed Book   *pending*
Page:     *pending*
Tax #:     **07000-3053: Portion of Parcel No. 92 18 – Turner Industrial Site**

Submitted by Plaintiff:

_____
James A. Kelley - 9aug13

EXHIBIT 2